Filed 6/16/15  In re U.S. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re U.S. et al., Persons Coming Under the Juvenile Court Law. | H041803 (Santa Clara County Super. Ct. Nos. 110JD020029, 110JD020030) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. J.S., Defendant and Appellant. | |

In March 2010, the Santa Clara County Department of Family and Children's Services (Department) filed two separate petitions alleging the failure of the Mother, J.S., to protect and provide support for her son, U.S. (then 11), and her daughter, K.S. (then 5) (collectively, the minors), under Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1]  The minors had been taken into protective custody after Mother

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

was arrested at her home for being extremely intoxicated and incoherent, and because she was unable to explain a trail of blood leading from her house. Police had determined that Mother had struck a neighbor with a vase in K.S.'s presence. Neighbors had also reported to police that Mother was intoxicated nearly daily and that she had permitted the minors "to run around the streets."

The juvenile court sustained the Department's petitions and ordered reunification services for Mother as well as for the minors' father, R.S. (Father). In February 2011, the minors were placed in the home of their paternal aunt in Reno, Nevada. The court terminated services for the parents at the 18-month review hearing in September 2011. On May 30, 2012, the court granted legal guardianship of the minors to their paternal aunt and dismissed the two dependency proceedings.

More than three years after the minors were placed in the care and custody of their paternal aunt, in October 2014, Mother filed a petition under section 388 to change the court's prior orders. She requested that guardianship of the minors be terminated and the minors be returned to her care. In December 2014, the court denied her petition without an evidentiary hearing.

On appeal, Mother contends the juvenile court erred by failing to set an evidentiary hearing. She asserts she made a sufficient showing in her petition to require the court to set and conduct a hearing. Alternatively, she argues that since it appears the court may have denied her petition based upon its understanding that it *was* conducting an evidentiary hearing, Mother was denied due process because she was not afforded the opportunity to present evidence in support of her petition.

We conclude the court did not abuse its discretion in denying Mother's petition without an evidentiary hearing because Mother failed to make a prima facie showing that the relief she sought was in the minors' best interests. We also reject Mother's claim that the juvenile court in fact conducted an evidentiary hearing and thereby denied Mother's due process rights. Accordingly, we will affirm the order denying Mother's petition.

2

FACTS AND PROCEDURAL HISTORY

## I.    Initial March 2010 Petitions and Detention Orders

On March 12, 2010, the Department filed two virtually identical petitions alleging the parents had failed to protect the minors.  (§ 300, subd. (b).)  The Department alleged,[2] among other things, that the minors were placed in protective custody after Mother was arrested for being under the influence of alcohol (blood alcohol content of .223).  "[M]other was incoherent and unable to adequately care for her children nor make other arrangements for their care."

Social Worker Vivian Sanchez had reported that four San José Police Officers had responded to a late-night neighborhood disturbance call and were present at Mother's home when Sanchez arrived.  Officers reported that upon their arrival, Mother was extremely intoxicated, out of control, combative, and belligerent.  Upon their inspection of the premises, the officers found a trail of blood leading from Mother's apartment and around the block.  Mother had no recollection of what had happened.  One of the officers interviewed two neighbors, who stated that Mother was intoxicated almost daily, and "there [were] different characters constantly coming in and out of the apartment."  The neighbors expressed concern about the minors' well-being and that "the children are observed to be running around the streets at all hours without any supervision."

K.S. reported to Social Worker Sanchez "that her mommy [had] hit her friend with a vase on the mouth and he was bleeding."  K.S. said she did not know why they had been fighting.  K.S. also said Mother had sometimes left U.S. and her alone, but her brother took good care of her.  K.S. also told Sanchez that Father was homeless and she last saw him "after Christmas."

---

[2] To avoid repetition, we will sometimes dispense with the phrase "the Department alleged" to describe the allegations contained in the petitions.

3

Sanchez interviewed Mother at the scene when she was arrested and found her to be slurring her words, incoherent, and "going on about many stories which did not make sense." Mother also could not explain why there was blood on her apartment floor or outside her front door.

Sanchez inspected the apartment. It was "unkempt and filthy" and had clothes, food, and other items strewn around. There were roaches in many places.

Mother had a longstanding substance abuse issue that included alcohol, crystal methamphetamine, and marijuana. She also had criminal convictions, which resulted in a number of incarcerations that interfered with her ability to parent her children. Mother had two older children who were made dependents of the court in 1995. She was provided reunification services in those proceedings, but her parental rights were ultimately terminated. The whereabouts of Father—who also had longstanding substance abuse issues and a significant criminal history—were unknown. There had been 10 prior referrals concerning Mother's and Father's general neglect, caretaker absence/incapacity, emotional abuse, and sexual abuse of their children.[3]

In amended petitions, the Department alleged that Mother had struggled for years to maintain her mental health and had spent several weeks in 2006 in a psychiatric hospital. Her untreated mental health issues negatively affected her ability to parent the minors.

On March 12, 2010, the court ordered the minors detained pursuant to section 319, subdivision (a). It ordered that Mother be permitted supervised visitation of the minors a minimum of one hour, one time per week.

---

[3] In a report attached to both petitions, the social worker stated that there had been "22 known prior CPS referrals for this family in this county and other counties."

## II.    *May 2010 Jurisdiction/Disposition Reports*

### A.    Jurisdiction/Disposition Reports

In its May 2010 jurisdiction/disposition reports, the Department reiterated the circumstances that led to the filing of the petitions. Father told Social Worker Christopher Peck that he had been unaware of what had happened to the minors. Father said that when Mother was not drinking, she was a good parent. He told Peck he had been living on the streets or in emergency shelters for five years. Father acknowledged prior substance abuse issues, but stated he had been sober one to two years and he no longer used drugs.

Peck met with Mother on four occasions. Mother said her substance abuse issues started when she was 11 years old (30 years earlier). She had used alcohol, marijuana, and crystal methamphetamine "on an almost daily basis." Mother admitted she had a substance abuse problem and had been in trouble with the law. She also told Peck she had not been feeling mentally healthy for some time and had been experiencing hallucinations even without having taken illegal drugs. She requested a psychiatric evaluation so she could possibly receive psychotropic drugs to feel better.

In summarizing the prior child welfare referrals, the Department noted a referral from 2001 that involved Mother having passed out on the front lawn due to intoxication, resulting in her arrest. In 2004, at the time of K.S.'s birth, K.S. and Mother had both tested positive for opiates. In 2005, there was a substantiated referral that involved Mother's general neglect of the minors. And there were three referrals in 2008 involving Father's general neglect of K.S., for whom Father had cared before she turned five years old.

Mother's criminal history consisted of approximately nine misdemeanor and two felony convictions, many relating to alcohol or drugs. Father's criminal history involved approximately 15 and 6 misdemeanor and felony convictions, respectively.

The Department indicated that the parents' substance abuse issues and Father's chronic homelessness impeded their ability to safely parent the minors. It recommended, among other things, that Mother and Father be offered reunification services and that they be assessed for substance abuse treatment programs.

B.    Addendum Reports

Social Worker Peck indicated in an addendum report that Mother had told him she had obtained employment, but she had not provided any details. Mother had been previously referred to Alcoholics Anonymous (AA) meetings, but she had not supplied the Department with proof of attendance at any meetings. During the two visits Mother had with the minors that Peck had supervised, she had been "very appropriate." Mother missed one visit due to her work.

In another addendum report, the Department indicated it had been exploring potential placement of the minors with relatives either in California or in an out-of-state placement. Mother told Peck that under the terms of her probation, she was required to "complete a 52-week Living without Violence program and an outpatient substance abuse treatment program." Peck encouraged Mother to engage in recommended services to facilitate reunification with her children. It was reported that Mother and Father continued to have separate, weekly, two-hour supervised visits with the minors. The Department noted that Father's visits appeared to have gone well, and that Mother's visits had "[gone] well for the most part."

III.    *May, July 2010 Jurisdictional/Dispositional Hearings*

A contested jurisdictional hearing took place on May 4, 2010. The court sustained the allegations of the petitions and found it had jurisdiction over the minors pursuant to section 300, subdivisions (b) (failure to protect).

A dispositional hearing took place on July 8, 2010. The court adjudged the minors to be dependent children; determined by clear and convincing evidence that their welfare required they be taken from the custody of the Mother; determined by clear and

6

convincing evidence that placement of the minors with the noncustodial parent would be detrimental to the minor's welfare; ordered the minors under the continued care of the Department in an approved foster home; and ordered that Mother and Father receive reunification services.

### IV. August 2010 Interim Report

The Department noted in an August 2010 interim report that Mother had completed a parenting orientation class during that month. She had also attended 29 AA meetings. The Department also noted that Mother told a social worker on July 28 that she did "not think she is able to resume the parental role with her children any time soon due to her own disability and personal issue[s]."

### V. Report and January 2011 Six-Month Review Hearing

At the six-month review hearing, the Department reported that both minors were placed in the same foster home in Santa Clara County. They were reported to have "adjust[ed] well in their placement and . . . [were] thriving." The Department was considering placement of the minors with their paternal aunt in Reno, Nevada. Mother was on parole, was complying with her parole conditions, and was working on her case plan services.[4] She was reported to have been appropriate during her visits with the minors, but had missed some visits because she said she had been sick.

On January 6, 2011, the court conducted a six-month review hearing. It found that conditions still existed which justified the initial assumption of jurisdiction under section 300, and it ordered the minors under the continued care, custody, and control of the Department in an approved foster home.

---

[4] There are conflicts in the record as to whether Mother was on probation or parole during the dependency proceedings.

*VI.     January 2011 Placement Order*

On January 24, 2011, the Department submitted an ex parte application seeking approval of a change of placement for the minors.  The Department indicated that a paternal aunt in Reno, Nevada, was willing to provide a home for the minors and, if the minors could not return home, was willing to become their legal guardian or adoptive parent.  The court granted the Department's ex parte application to change the placement of the minors on January 24, 2011.  Mother agreed to the placement change.

*VII.     Report and May 2011 12-Month Review Hearing*

The Department submitted a 12-month review hearing report in May 2011.  It reported that the minors had been living with their aunt in Reno since February 5, 2011, and both were adjusting well to their new schools.  Mother had successfully completed a dual-diagnosis outpatient treatment program relating to patients with both substance abuse and mental health issues.  Mother had indicated she was grateful to the aunt for caring for the minors, and she stated that she could "see that her children [were] very happy through the photos that were shared with her and [from] speak[ing] with them by telephone."  Since the time of the minors' placement with their aunt, Mother had "declined to travel to Reno for [] weekly visit[s] due to her current circumstances and personal health issue[s]."  She instead requested weekly telephone visits with them.

The Department recommended that family reunification services for Mother and Father continue to be offered for an additional six months.  On May 2, 2011, the court adopted the recommendations of the Department.

*VIII.     Report and September 2011 18-Month Review Hearing*

In its 18-month review hearing report in September 2011, the Department observed that Mother had made "good progress in her case plan and had achieved a completion certificate from the substance abuse program and [had] drug test[ed] regularly with mostly negative results."  But Mother continued to decline proposed visits with the minors "due to her own personal health and mental health[-]related issues."  The

8

Department recommended that reunification services be terminated. On September 27, 2011, the court adopted the recommendations of the Department and terminated services for both parents. It also scheduled a selection and implementation hearing under section 366.26 (the .26 hearing or permanency hearing).

*IX.     Report and May 2012 Permanency Hearing*

The Department in its report filed in anticipation of the .26 hearing recommended a permanent plan of long-term foster care. It suggested that formal legal guardianship of the minors in favor of their paternal aunt be explored, noting that such an arrangement would have to be formalized in the state of Nevada where they resided. The Department also reported that since the minors had relocated, weekly roundtrip bus tickets to Reno had been offered to both parents. Mother had declined to use those tickets and had instead called the minors twice per week. But she had nonetheless arranged her own transportation to Reno to visit with them on the July 4th (2011) weekend.

In a further report, the Department recommended a permanent plan of legal guardianship for the minors and dismissal of the dependency proceedings. The paternal aunt had indicated that legal guardianship, rather than adoption, was in the minors' best interests because of their "healthy relationship with both of the parents." The Department indicated the aunt was "supportive of the parents and she [would] continue to foster such relationship for the children."

The court conducted the permanency hearing on May 30, 2012. At the hearing, the court adopted the recommendations of the Department. It ordered legal guardianship to the paternal aunt as the permanent plan for the minors, and it dismissed the dependency proceedings. It also ordered that Mother and Father receive supervised visitation with the minors a minimum of once a month for four hours, along with weekly telephone visits.

9

*X.     October 2014 Petition to Change Court Order*

In October 2014, Mother filed a request to change court order (petition) in the dependency proceeding for U.S., pursuant to section 388.[5]  She requested that the court issue an order terminating the guardianship and returning the minors to her care.  The court calendared the matter to determine whether to hold an evidentiary hearing on Mother's petition.  The Department opposed the petition.  On December 11, 2014, the court denied Mother's section 388 petition, finding that Mother had not shown that the relief sought in the petition was in the minors' best interests.

Mother filed a timely notice of appeal.  The order from the denial of her section 388 petition is one from which an appeal lies.  (*In re K.C.* (2011) 52 Cal.4th 231, 235-236, citing section 395.)

DISCUSSION

*I.     Applicable Law*

A.     General Dependency Principles

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare.  [Citations.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  As our high court has explained, "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.  [Citations.]  Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the

---

[5] Mother apparently did not file a separate petition in K.S.'s dependency proceeding.  But when the court considered whether to schedule an evidentiary hearing on Mother's petition, it expressly considered both dependency proceedings.  Thus, the court's order denying the petition applies to both proceedings.

10

absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.) There are six statutory choices for the permanency plan. Although the preferred choice is an order that the child be placed for adoption, coupled with the termination of parental rights (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53), the court—as it did here—may "[a]ppoint a relative or relatives with whom the child is currently residing as legal guardian or guardians for the child, and order that letters of guardianship issue." (§ 366.26, subd. (b)(3).)

B. Section 388 Petitions to Change Orders

At any time after the court has determined a child to be a dependent of the juvenile court, "[a]ny parent or other person having an interest in the child" may by verified petition request the court to change, modify or set aside a previous juvenile court order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).) A petition under section 388 is appropriate to seek a change of a prior guardianship order and to change custody to have a child returned to the parent. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1090, 1086-1087.) Likewise, a section 388 petition may be brought to seek the modification of a prior permanency order. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 414.)

11

If the court determines from the petition that "it appears that the best interests of the child . . . may be promoted by the proposed change of order," it shall schedule a hearing on the matter. (§ 388, subd. (d) (hereafter, § 388(d)).) The petition is liberally construed in favor of its sufficiency. (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 415; see also Cal. Rules of Court, rule, 5.570(a).) Thus, a parent seeking modification of a prior court order pursuant to a section 388 petition must "make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]" (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) "There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; see also Cal. Rules of Court, rule 5.570(d) [petition may be denied ex parte if petitioner fails to state change of circumstance or new evidence or "fails to show that the requested modification would promote the best interest of the child"].) If the petition's allegations, liberally construed, do not show changed circumstances under which the child's interests would be promoted by changing a prior order, the court need not order a hearing on the section 388 petition. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see generally Seiser & Kumli on Cal. Juvenile Courts Practice and Procedure (Matthew Bender 2014) § 2.140[2], p. 2-468 [law is "clear that a hearing is not required if the petition fails to make a sufficient showing to justify one"].) Such summary denial does not violate the due process rights of the petitioner. (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414.)

The parent's burden of showing that changed circumstances are sufficient such that the child's interests would be promoted by modifying a prior order "is a difficult [one] to meet in many cases, and particularly so when . . . reunification services have been terminated or never ordered. After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for

12

permanency and stability.  [Citation.]"  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)  As such, any order made following a petition brought under section 388 modifying a prior order involving custody or visitation of a dependent child must be based upon the court's "find[ing] by clear and convincing evidence that the proposed change is in the best interests of the child."  (§ 388, subd. (a)(2).)

A determination on whether to change an order by granting a section 388 petition "is 'committed to the sound discretion of the juvenile court, and [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.'  [Citation.]  An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination.  [Citation.]"  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642, quoting and citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  This abuse of discretion standard also applies where the court denies a section 388 petition without an evidentiary hearing.  (*In re G. B.* (2014) 227 Cal.App.4th 1147, 1158.)

II.     *Evidentiary Hearing on Section 388 Petition Was Properly Denied*

A.     Background Concerning Section 388 Petition

1.     *Petition and Order Setting Hearing*

On October 8, 2014[6]—more than three years after the minors were placed in the care and custody of their paternal aunt—Mother filed her petition.  She requested a change to the court's prior order appointing the aunt as guardian and dismissing the proceedings.  She indicated she was now free of alcohol and drug dependency, was recently married, and was prepared to complete her case plan.  She also indicated that the changes in circumstances in her life were that she (1) had completed all court-ordered classes; (2) was completely free of alcohol and drugs; (3) had "moved away from [her]

---

[6] All dates hereafter are 2014 unless otherwise specified.

13

old environment"; and (4) was living in a new county with her husband. She indicated that the requested modification of the order would be in the minors' best interests because it would allow them to be back in her life with a "new beginning"; would permit them to thrive, grow[,] learn how to get through life with a [b]iological parent"; and she would "direct them, nu[r]ture them in a healthy, positive, stable home."

The court placed the matter on calendar for November 20 (later continued to December 11) to determine whether to hold an evidentiary hearing on Mother's petition.

### 2. *Department's November 2014 Report*

The Department filed a report opposing Mother's petition, contending that termination of the guardianship was not in the minors' best interests. It repeated the history of the proceedings involving the minors and the child welfare history involving Mother, including prior proceedings in which Mother's parental rights of her two older children were terminated.

Social Worker Susie Wong met with the minors' legal guardian (the paternal aunt) on November 9. The paternal aunt and the minors had moved from Reno to Ripon, California, in August. The paternal aunt had recently started a new full-time job. She had moved to Ripon to be closer to her elderly mother and because she thought it would facilitate more frequent visits of the minors by their parents.

The paternal aunt stated that Mother had visited her children in Reno approximately three to four times a year. But Mother had also missed two scheduled visits with the minors, which had greatly disappointed them. The paternal aunt had indicated that she welcomed Mother's visits but felt they disrupted the minors' routine and structure, citing two examples from Mother's unsupervised visit of the minors in October. Mother had called to tell the paternal aunt that she would pick up the minors at 12:30 a.m. because she did not get off from work until 11:00 p.m. But Mother did not arrive until 3:00 a.m., after the minors had fallen asleep in the living room waiting for her. Then, although the paternal aunt had asked Mother to return the minors by 6:00 p.m.

14

on Sunday because they had school the next day, Mother did not arrive until 9:30 p.m. Mother cited a broken windshield wiper as the reason for being late; however, it had not rained that Sunday. The paternal aunt also reported that U.S. had told her that Mother had let him drive a car on two occasions when he was only 14 and had no learner's permit.

Wong spoke by telephone with Mother on November 7. Mother said she had gotten married in September 2013 and had been living in Fresno since early 2014. Wong asked Mother for information about her husband so a criminal background check could be performed. "[M]other giggled and did not respond to the question." Wong explained the importance of knowing the background of people living in the home, but "[M]other giggled again [and] did not provide the information." Wong requested that Mother come to the San José office the following week to be interviewed, but Mother responded she could not. After Wong explained the importance of Mother's providing information showing she could care for the minors, Mother said she could not get a ride from Fresno. Wong "asked [M]other where she lived last year. [M]other said[,] 'I told you three times. I'm in Fresno and that's why I can't come next week.' [Wong] said, 'I understand you live in Fresno. I'm asking where did you live last year?' [M]other giggled again and said, 'You're so funny.' "

Wong reported that Mother did not answer Wong's questions throughout the telephone call and did not engage in the conversation. Mother indicated she had been clean and sober for three years. In response to asking whether she had completed her case plan, Mother stated she had done so. Wong requested, and Mother agreed to mail, documentation confirming she had completed her case plan. Wong again requested that Mother schedule an interview, but Mother terminated the call, saying there was someone at the door. Mother agreed to call Wong on November 10, but Mother had not contacted Wong as of November 17.

The Department reported that the minors appeared to be happy and relaxed in the home environment with their guardian. The minors stated they were happy living with their aunt. U.S. (16) stated that he had a career goal planned after he finished high school and that he wanted to live with his aunt until he was 20. He said he was very glad his aunt would emotionally and financially support him in achieving his career goal. K.S. (10) had a close relationship with her brother and her paternal aunt. The Department indicated that the paternal aunt had been providing the minors with a structured environment, good care, and support for almost four years. The Department concluded "it would be detrimental to remove [the minors] from [that] current stable and nurturing environment."

### 3. *Department's December 2014 Report*

The Department filed a supplemental report reiterating its recommendation that Mother's petition be denied. Social Worker Wong met with Mother and her husband in court on November 20. Mother—contrary to what she had said previously to Wong about having been clean and sober for three years—said she had been clean and sober since 2012. Neither she nor her husband was working. Mother told Wong: " 'I want my children back because my life is empty without them.' " She said she had changed and wanted to raise the minors as a family.

On December 3, Wong met with Mother at her two-bedroom apartment obtained through Section 8 housing in Fresno. The home was clean and tidy. Mother stated that she spoke weekly with the minors by telephone. She provided Wong with documentation concerning her work on her case plan, which consisted of a certificate of completion of a parent orientation course in 2010; a certificate of completion of a substance abuse treatment course in 2011; sign-up sheets showing attendance at AA meetings in 2010 and 2011; and an undated (apparently February) drug testing laboratory report. Mother also told Wong she had taken a parenting class and received counseling previously, but did not recall the names of the providers.

16

On December 7, Wong spoke with the paternal aunt by telephone. The aunt said that Mother had taken the minors to lunch on November 29, and Mother had picked them up and dropped them off on time. Wong spoke with the minors on December 7, and they both said they were happy at home with their aunt.

### 4. *Hearing*

Although the matter was originally set for November 20, the court, at the request of counsel for both Mother and the minors, continued the matter to December 11. On that date, the Department, through counsel, argued that Mother had not presented a prima facie case through her petition to warrant the scheduling of an evidentiary hearing. The Department acknowledged that while Mother's statements about her life potentially indicated changed circumstances, she had not shown that termination of the guardianship and return of the minors to her was in the minors' best interests. Counsel for the Department also argued that if the court were "to hear this matter," the materials presented in the two reports showed that the minors' best interests would be served by having them continue to remain in the care of their paternal aunt with visitation by Mother.

Counsel appointed to represent the minors joined in the Department's position. Minors' counsel argued that, even construing Mother's petition liberally on the question of whether to grant a hearing, Mother had not made a prima facie showing that termination of the guardianship and a change of custody would be in the minors' best interests. Minors' counsel also indicated she had met with the minors who said they wanted their visits with Mother to continue but were very comfortable living with their aunt and did not want to have their living arrangements changed.

Mother's counsel argued that Mother had demonstrated a change of circumstances: she had moved away from San José where there had been influences that had led to the dependencies; had remarried and was in a healthy and happy relationship; had been going to church; and had been maintaining her sobriety and had been working with a sponsor.

17

On the question of the minors' best interests, Mother's counsel argued that Mother felt very strongly it was in K.S.'s best interests that she live with her mother. As to U.S., counsel indicated that Mother acknowledged that he was 16 years old, that he had a great deal of say concerning where he wanted to live, and that he had settled in with his aunt. Counsel stated that Mother "would like the opportunity to have a bigger hearing" on her section 388 petition.

The court found there had been a showing of a change in circumstances presented in the petition, but concluded as to "the second prong, that being whether or not the requested change is in the best interest of the minors, it is the Court's decision and finding that it would not be. Both of these young people have been in a stable, permanent home with a guardian, who is a relative, and are thriving in that home." The court indicated that "based on that," it would "deny the 388 [petition]."

## B. The Court Did Not Abuse Its Discretion Denying the Petition

### 1. No Error in Not Setting an Evidentiary Hearing

Mother contends the court abused its discretion by denying her petition without scheduling an evidentiary hearing pursuant to section 388(d). To require the court to set such a hearing, Mother was required to have shown in the petition, liberally construed, both "(1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.]" (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.) Stated conversely, the court could have summarily denied Mother's petition if she had "fail[ed] to state a change of circumstance or new evidence that may require" the requested change of order or had "fail[ed] to show that the requested modification would promote the best interest of the child." (Cal. Rules of Court, rule 5.570(d).) Although the court concluded that Mother had made a prima facie showing of a change of circumstances, it found she had not satisfied her burden of showing that the requested change would be in the best interests of the minors (the second prong).

18

The court did not abuse its discretion by making these findings. Mother stated in her petition that modification of the prior guardianship order would allow the minors to be back in her life with a "new beginning"; would permit them to "thrive, grow[,] learn how to get through life with a [b]iological parent"; and she would "direct them, nu[r]ture them in a healthy, positive, stable home." These conclusory statements were insufficient to show that modification of the guardianship order was in the minors' best interests.

A petition filed under section 388 "may not be conclusory." (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250; see also *In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) Notwithstanding the court's obligation to liberally construe a petitioner's filing, the allegations "must nonetheless describe specifically how the petition [would] advance the child's best interests. [Citation.]" (*In re G. B.*, *supra*, 227 Cal.App.4th at p. 1157.) Thus, in *Anthony W.*, the appellate court, in affirming the juvenile court's denial of a section 388 petition without ordering an evidentiary hearing, noted that "[s]uccessful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence. [Citation.]" (*Anthony W.*, at p. 250.) In *Anthony W.*, the petitioner had submitted a bare petition without any "specific information; *she did not attach any documents in support of her petition or provide names or dates.*" (*Id.* at p. 251, fn. 4, original italics.) Likewise, the petition in this case contained nothing concrete to show the requested change would be in the minors' best interests. Indeed, implicit in Mother's argument defending the adequacy of her petition is the assertion that the recent change in *her* circumstances was *itself* in the best interests of the minors. But accepting this implicit assertion would undermine the child-centered focus that the best-interests prong requires under section 388(d).

The analysis of the court in *Angel B.*, *supra*, 97 Cal.App.4th 454 is instructive. In that case, the court denied the mother's section 388 petition without scheduling an evidentiary hearing and shortly thereafter terminated her parental rights. (*Id.* at pp. 458-459.) The appellate court noted that "[w]hether [m]other made a prima facie showing

19

entitling her to a hearing depend[ed] on the facts alleged in the petition, as well as the facts established as without dispute by the court's own file." (*Id.* at p. 461.)  It held the juvenile court had not abused its discretion in denying the mother a hearing.  (*Id.* at p. 462.)

In reaching its conclusion, the *Angel B.* court contrasted its circumstances with those in three appellate cases in which the juvenile court's summary denial of section 388 petitions was reversed.  (*Angel B.*, *supra*, 97 Cal.App.4th at pp. 462-463.)  In *In re Jeremy W.*, *supra*, 3 Cal.App.4th at pages 1415 to 1416, the mother-petitioner, in addition to her own declaration, had submitted the declaration of her doctor opining that she was currently able to care for her child.  She had also submitted her mother's declaration indicating that her daughter was able to care for her child and the child had indicated he wanted to be reunited with his mother.  (*Id.* at p. 1416.)  Similarly, in *In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1798, the mother presented a declaration from her doctor describing her ongoing therapy in which the doctor opined the mother was able to adequately supervise her son full time, and recommended the son be returned to the mother's custody.  And in *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432, the mother, in addition to showing improvements in her situation, including completion of various courses, showed that her children repeatedly stated they wished to live with their mother.

The *Angel B.* court observed that, in contrast to those three appellate decisions, Angel B.'s mother had submitted no evidence in her section 388 petition that she was ready to assume full-time care and custody of her child. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 463.)  The court observed that although Angel B.'s mother had indicated she had completed a drug program, the length of her sobriety "was very brief compared to her many years of drug addiction . . . and in the past she had been unable to remain sober even when the stakes involved were the loss of her other child." (*Ibid.*)  It also noted the mother had failed to establish that her current living arrangements were suitable for her child.  (*Ibid.*)  And the court, in affirming the summary denial of the

20

mother's petition, emphasized there was no evidence the minor preferred living with his mother rather than continuing to live with his foster family. (*Ibid.*)

The circumstances here are similar to those in *Angel B.* There was nothing in Mother's petition beyond her own conclusory statements that she had maintained her sobriety and was ready to care for the minors. As was the case in *Angel B.*, Mother's period of her claimed sobriety (approximately two years) was relatively brief as compared with her 30-year history of substance abuse, and she had previously lost custody of her two older children because she was unable to maintain her sobriety. (See *Angel B.*, *supra*, 97 Cal.App.4th at p. 463.) Moreover, there was no evidence the minors preferred to live with Mother rather than their aunt. (See *ibid.*) Indeed, the evidence was directly to the contrary. As indicated by the minors' counsel, they wanted to continue to live with their aunt while maintaining a visiting relationship with Mother.

Furthermore, where, as here, a change in placement is sought after the court has terminated services, the focus shifts to the "needs of the child for permanency and stability," and there is a rebuttable presumption that continued foster care is in the child's best interests. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 324-325.) Mother's allegations that the requested change in placement was in the minors' best interests were conclusory and inadequate. (*In re G. B.*, *supra*, 227 Cal.App.4th at p. 1157; *In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.) In other words, the allegations of the petition did not rebut the presumption that the minors' continued placement with their guardian—which had been ongoing for nearly four years—was in the minors' best interests.

### 2. *There Was No Evidentiary Hearing*

Mother's challenge to the court's order is based upon the alternative argument that the order is ambiguous. She asserts it is unclear whether the court denied the petition because there had not been a prima facie showing warranting the granting of an evidentiary hearing, or, alternatively, the hearing the court conducted *was* an evidentiary hearing and the court found insufficient evidence that the minors' best interests would be

21

promoted by the requested change of order.  She contends she made a sufficient showing to warrant an evidentiary hearing, but, alternatively, argues that she was denied due process if the hearing held *was* an evidentiary hearing because she was not given the opportunity to present affirmative evidence on the best-interests prong.

In support of her position, Mother relies heavily upon a brief colloquy between her counsel and the court at the conclusion of the December 11 hearing.  After argument by counsel, the juvenile court judge said:  "I believe that there is a showing of a change in circumstances. . . [¶] Regarding the second prong, that being whether or not the requested change is in the best interest[s] of the minors, it is the Court's opinion and decision that it would not be.  Both of these young people have been in a stable, permanent home with a guardian, who is a relative, and are thriving in that home."  Following some intervening discussion, Mother's counsel inquired:  "Your Honor, may I just clarify?  Is the Court denying the 388 [petition] because a prima facie showing has not been made, or because the Court is finding that it would not be in the children['s] best interest[s]?"  The court responded, "That it would not be in the in the children['s] best interest[s]."  To understand this colloquy, it must be placed in the context of the entire proceedings.

After Mother filed her petition, the court entered an order placing the matter on calendar for November 20, using a preprinted Judicial Council Form JV-183.  That form contained the following handwritten language:  "This matter is set to determine whether to hold a hearing."  Mother argues this order is ambiguous, because on the preprinted form, above the handwritten language, was the following:  "The court orders a hearing on the form JV-180 request because the best interest of the child may be promoted by the request."  We disagree with Mother's argument.  We conclude the handwritten notation

22

overrode the preprinted language of the form, making it clear the court was *not* setting an evidentiary hearing under section 388(d).**7**

In further support of our conclusion, at the initial hearing on November 20, the Department's counsel made clear her understanding that the court had *not* granted an evidentiary hearing on the petition pursuant to section 388(d): "We are [here] for a 388 [petition] filed by the mother, and the 388 [petition] listed that the Court had not yet granted a 388 hearing. Our position is that this 388 [petition] does not meet the standard and should not be granted and should be dismissed outright. I'll submit on the report for today[,] recommending that the Court not make any changes with respect to the 388 [petition,] as [the petition] fails to state a prima facie [case]." After the court entertained and granted a motion to continue the matter, it indicated: "As [c]ounsel correctly stated, the Court put this on to determine whether or not to hold a 388 hearing."

On December 11, the Department's counsel reiterated her understanding that the court was considering *whether to set* an evidentiary hearing on the petition: "The Court initially set this matter for a hearing to determine if a hearing was warranted." The Department's counsel went on to argue that, "on the issue of whether the hearing is warranted," Mother demonstrated a change of circumstances but "the petition on its face does not indicate why terminating the guardianship would be in the children[']s best interest[s]." Likewise, the minors' counsel argued "that even if the Court construes the 388 [petition] liberally on its face, which the Court should be doing when determining whether or not to grant the hearing, while I do believe that [Mother] has had changed circumstances, I don't believe that the JV-180 [petition] shows that it would be in the

---

**7** It appears there is no preprinted form enabling the court to calendar the matter to determine whether to order an evidentiary hearing under section 388(d). That being the case, the court here simply utilized the form designed for setting an evidentiary hearing as a matter of convenience, clarifying that the hearing it *was* setting was *not* one pursuant to section 388(d).

23

children[']s best interest[s] to be returned to her care at this time." The argument of Mother's counsel also made clear that she, as well, understood that the purpose of the hearing was for the court to determine whether to set a hearing on the petition. She argued that Mother had "met her burden to make a prima facie showing" of change of circumstances, and requested "a bigger hearing" on the petition.

Based upon this record, Mother's argument that the court conducted an evidentiary hearing on her petition ignores critical aspects of the record and therefore places an improper interpretation of the colloquy between her counsel and the court. The record is clear that both the parties and the court understood that the proceeding before the court was to determine whether a prima facie showing had been made by Mother to warrant the setting of an evidentiary hearing pursuant to section 388(d). Furthermore, Mother had the burden of making a two-prong showing of (1) changed circumstances/new evidence and (2) best interests for *both* the setting of an evidentiary hearing under section 388(d) *and* for the granting of the petition. Therefore, the court's response to the inquiry of Mother's counsel "[t]hat it would not be in the children[']s best interest[s]" does not clearly reflect, as claimed by Mother, that the court was denying the petition after having considered the matter in a purported evidentiary hearing.

*In re G. B.*, *supra*, 227 Cal.App.4th 1147 is instructive. There, as here, after the mother filed a section 388 petition, the court, using a Form JV-183 order, checked the box indicating "that a hearing was ordered to consider the petition 'because the best interest of the child may be promoted by [it].' " (*Id.* at p. 1154.) At the hearing, the mother's counsel stated "her understanding that 'we are on for a setting of [the . . . section 388 petition,' " and the agency's counsel argued that the mother was not entitled to a hearing because she had not satisfied either the changed circumstances or the best interests prongs. (*Ibid.*) The juvenile court indicated it had liberally construed the petition to afford the parties a chance to argue whether there should be an evidentiary hearing, and then denied the setting of such a hearing. (*Ibid.*)

24

The appellate court held this was not an abuse of discretion. (*In re G. B.*, *supra*, 227 Cal.App.4th at pp. 1158-1159.) There, the court, looking at the overall context (as we do here), rejected the contention that the court had set an evidentiary hearing because of its use of the Form JV-183 order: "[A] contextual review of the record here shows that in checking the box on the form order indicating such a [best interests] finding, the juvenile court was not deciding that a prima facie case had been made but was instead scheduling the matter for the parties to argue the issue—an option not included on the form. When the court heard the parties' oral argument on whether an evidentiary hearing was required, it expressly clarified that it had liberally construed mother's petition '*in order to have an opportunity for the parties to argue for a hearing.*' (Italics added.)" (*Id.* at p. 1158, fn. omitted.) The court concluded: "[T]he parties here did not come to court expecting an evidentiary hearing; mother's counsel anticipated only that such a hearing would be *set*, and she understood that the Agency objected. [Citation.]" (*Id.* at p. 1159, original italics.)

The court here did not deny Mother's section 388 petition after an evidentiary hearing. Instead, it summarily denied the petition and concluded Mother was not entitled to an evidentiary hearing under section 388(d) because she had failed to make a prima facie showing that the best interests of the minors would be promoted through the relief sought in the petition. Such summary denial was not an abuse of the court's discretion and did not violate Mother's due process rights. (*In re Jeremy W.*, *supra*, 3 Cal.App.4th at pp. 1413-1414.)

## DISPOSITION

The December 11, 2014 order denying Mother's petition under section 388 is affirmed.

_____

Márquez, J.

WE CONCUR:


_____

Rushing, P. J.


_____

Grover, J.